# Exhibit A



**SOCIAL SECURITY ADMINISTRATION**



Office of Hearings Operations
2ND FLOOR
4100 OLD MILTON PKWY
ALPHARETTA, GA 30005-4442

Date: April 29, 2024

Firas Ahmad Hajibi

## Notice of Decision – Unfavorable

I carefully reviewed the facts of your case and made the enclosed decision.  Please read this notice and my decision.

**If You Disagree With My Decision**

If you disagree with my decision, you may file an appeal with the Appeals Council.

**How To File An Appeal**

To file an appeal you or your representative must ask in writing that the Appeals Council review my decision.  The preferred method for filing your appeal is by using our secure online process available at https://www.ssa.gov/benefits/disability/appeal.html.

You may also use our Request for Review form (HA-520) or write a letter.  The form is available at https://www.ssa.gov/forms/ha-520.html.  Please write the Social Security number associated with this case on any appeal you file.  You may call (800) 772-1213 with questions.

Please send your request to:

> **Social Security Administration**
> **Office of Appellate Operations**
> **6401 Security Blvd**
> **Baltimore, MD 21235-6401**

**Time Limit To File An Appeal**

You must file your written appeal **within 60 days** of the date you get this notice.  The Appeals Council assumes you got this notice 5 days after the date of the notice unless you show you did not get it within the 5-day period.

Form HA-L76-OP2 (07-2023)

**Suspect Social Security Fraud?**
**Please visit http://oig.ssa.gov/r or call the Inspector General's Fraud Hotline**
**at 1-800-269-0271 (TTY 1-866-501-2101).**

See Next Page

Firas Ahmad Hajibi (BNC#: 21FG525F51142)                                   Page 2 of 3

The Appeals Council will dismiss a late request unless you show you had a good reason for not filing it on time.

**What Else You May Send Us**

You or your representative may send us a written statement about your case.  You may also send us new evidence.  You should send your written statement and any new evidence **with your appeal**.  Sending your written statement and any new evidence with your appeal may help us review your case sooner.

**How An Appeal Works**

The Appeals Council will consider your entire case.  It will consider all of my decision, even the parts with which you agree.  Review can make any part of my decision more or less favorable or unfavorable to you.  The rules the Appeals Council uses are in the Code of Federal Regulations, Title 20, Chapter III, Part 404 (Subpart J) and Part 416 (Subpart N).

The Appeals Council may:

- Deny your appeal,
- Return your case to me or another administrative law judge for a new decision,
- Issue its own decision, or
- Dismiss your case.

The Appeals Council will send you a notice telling you what it decides to do.  If the Appeals Council denies your appeal, my decision will become the final decision.

**The Appeals Council May Review My Decision On Its Own**

The Appeals Council may review my decision even if you do not appeal.  If the Appeals Council reviews your case on its own, it will send you a notice within 60 days of the date of this notice.

**When There Is No Appeals Council Review**

If you do not appeal and the Appeals Council does not review my decision on its own, my decision will become final.  A final decision can be changed only under special circumstances.  You will not have the right to Federal court review.

**New Application**

You have the right to file a new application at any time, but filing a new application is not the same as appealing this decision.  If you disagree with my decision and you file a new application instead of appealing, you might lose some benefits or not qualify for benefits at all.  My decision could also be used to deny a new application for benefits if the facts and issues are the same.  If you disagree with my decision, you should file an appeal within 60 days.

Form HA-L76-OP2 (07-2023)

See Next Page

Firas Ahmad Hajibi (BNC#: 21FG525F51142)                                    Page 3 of 3

**If You Have Any Questions**

1. Visit www.ssa.gov for fast, simple, and secure online service.
2. Call us at **1-800-772-1213**, weekdays from 8:00 am to 7:00 pm. If you are deaf or hard of hearing, call TTY **1-800-325-0778**. Please mention this notice and decision when you call.
3. You may also call your local office at (877) 803-6320.

SOCIAL SECURITY
4365 SHACKLEFORD RD
NORCROSS, GA 30093-2931

Cynthia Weaver
Administrative Law Judge

Enclosures:
Decision Rationale

cc:    Kathleen Marie Flynn
       KATHLEEN M FLYNN LLC
       315 W PONCE DE LEON AV
       SUITE 940
       DECATUR, GA 30030

Form HA-L76-OP2 (07-2023)

**SOCIAL SECURITY ADMINISTRATION**
**Office of Hearings Operations**

**DECISION**

<table>
<tr><td><u>IN THE CASE OF</u></td><td><u>CLAIM FOR</u></td></tr>
<tr><td></td><td>Period of Disability, Disability Insurance</td></tr>
<tr><td>Firas Ahmad Hajibi</td><td>Benefits, and Supplemental Security Income</td></tr>
<tr><td>(Claimant)</td><td></td></tr>
<tr><td></td><td>21FG525F51142</td></tr>
<tr><td>(Wage Earner)</td><td>(Beneficiary Notice Control Number)<br>*Social Security Number removed for your protection*</td></tr>
</table>

**JURISDICTION AND PROCEDURAL HISTORY**

On April 2, 2021, the claimant protectively filed a Title II application for a period of disability and disability insurance benefits. The claimant also protectively filed a Title XVI application for supplemental security income on April 2, 2021. In both applications, disability was alleged beginning October 1, 2020. The claims were denied initially on January 24, 2022, and on reconsideration on August 24, 2023. The claimant subsequently filed a written request for hearing received on August 29, 2023 (20 CFR 404.929 *et seq.* and 416.1429 *et seq.*). On March 5, 2024, the undersigned held a telephone hearing. All participants attended by telephone, including the claimant and Silvio Reyes, an impartial vocational expert. The claimant testified with assistance of an Arabic interpreter at the hearing, and was represented by Brynne Holt, an attorney. His main representative is Kathleen Flynn, an attorney. The claimant submitted or informed the Administrative Law Judge about all written evidence at least five business days before the date of the scheduled hearing (20 CFR 404.935(a) and 416.1435(a)).

**ISSUES**

The issue is whether the claimant is disabled under sections 216(i), 223(d) and 1614(a)(3)(A) of the Social Security Act. Disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months. With respect to the claim for a period of disability and disability insurance benefits, there is an additional issue whether the insured status requirements of sections 216(i) and 223 of the Social Security Act are met. The claimant's earnings record shows that the claimant has acquired sufficient quarters of coverage to remain insured through March 31, 2024. Thus, the claimant must establish disability on or before that date in order to be entitled to a period of disability and disability insurance benefits.

After careful consideration of all the evidence, the undersigned concludes the claimant has not been under a disability within the meaning of the Social Security Act from October 1, 2020, through the date of this decision.

See Next Page

## APPLICABLE LAW

Under the authority of the Social Security Act, the Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is disabled (20 CFR 404.1520(a) and 416.920(a)).  The steps are followed in order.  If it is determined that the claimant is or is not disabled at a step of the evaluation process, the evaluation will not go on to the next step.

At step one, the undersigned must determine whether the claimant is engaging in substantial gainful activity (20 CFR 404.1520(b) and 416.920(b)).  Substantial gainful activity (SGA) is defined as work activity that is both substantial and gainful.  "Substantial work activity" is work activity that involves doing significant physical or mental activities (20 CFR 404.1572(a) and 416.972(a)).  "Gainful work activity" is work that is usually done for pay or profit, whether or not a profit is realized (20 CFR 404.1572(b) and 416.972(b)).  Generally, if an individual has earnings from employment or self-employment above a specific level set out in the regulations, it is presumed that he has demonstrated the ability to engage in SGA (20 CFR 404.1574, 404.1575, 416.974, and 416.975).  If an individual engages in SGA, he is not disabled regardless of how severe his physical or mental impairments are and regardless of his age, education, and work experience.  If the individual is not engaging in SGA, the analysis proceeds to the second step.

At step two, the undersigned must determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe" (20 CFR 404.1520(c) and 416.920(c)).  An impairment or combination of impairments is "severe" within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities.  An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work (20 CFR 404.1522 and 416.922, Social Security Rulings (SSRs) 85-28 and 16-3p).  If the claimant does not have a severe medically determinable impairment or combination of impairments, he is not disabled.  If the claimant has a severe impairment or combination of impairments, the analysis proceeds to the third step.

At step three, the undersigned must determine whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).  If the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of a listing and meets the duration requirement (20 CFR 404.1509 and 416.909), the claimant is disabled.  If it does not, the analysis proceeds to the next step.

Before considering step four of the sequential evaluation process, the undersigned must first determine the claimant's residual functional capacity (20 CFR 404.1520(e) and 416.920(e)).  An individual's residual functional capacity is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments.  In making this finding, the undersigned must consider all of the claimant's impairments, including impairments that are not severe (20 CFR 404.1520(e), 404.1545, 416.920(e), and 416.945; SSR 96-8p).

Next, the undersigned must determine at step four whether the claimant has the residual functional capacity to perform the requirements of his past relevant work (20 CFR 404.1520(f) and 416.920(f)). The term past relevant work means work performed (either as the claimant actually performed it or as it is generally performed in the national economy) within the last 15 years or 15 years prior to the date that disability must be established. In addition, the work must have lasted long enough for the claimant to learn to do the job and have been SGA (20 CFR 404.1560(b), 404.1565, 416.960(b), and 416.965). If the claimant has the residual functional capacity to do his past relevant work, the claimant is not disabled. If the claimant is unable to do any past relevant work or does not have any past relevant work, the analysis proceeds to the fifth and last step.

At the last step of the sequential evaluation process (20 CFR 404.1520(g) and 416.920(g)), the undersigned must determine whether the claimant is able to do any other work considering his residual functional capacity, age, education, and work experience. If the claimant is able to do other work, he is not disabled. If the claimant is not able to do other work and meets the duration requirement, he is disabled. Although the claimant generally continues to have the burden of proving disability at this step, a limited burden of going forward with the evidence shifts to the Social Security Administration. In order to support a finding that an individual is not disabled at this step, the Social Security Administration is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that the claimant can do, given the residual functional capacity, age, education, and work experience (20 CFR 404.1512, 404.1560(c), 416.912 and 416.960(c)).

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

After careful consideration of the entire record, the undersigned makes the following findings:

**1.    The claimant meets the insured status requirements of the Social Security Act through March 31, 2024.**

**2.    The claimant has not engaged in substantial gainful activity since October 1, 2020, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).**

**3.    The claimant has the following severe impairments: degenerative disc disease and degenerative joint disease (20 CFR 404.1520(c) and 416.920(c)).**

The above medically determinable impairments are found to significantly limit the claimant's ability to perform basic work activities as required by SSR 85-28. The claimant also has impairments which are not severe, discussed further below. The undersigned considered all of the claimant's medically determinable impairments, including those that are not severe, when assessing the residual functional capacity.

The claimant's medically determinable mental impairments of anxiety, depression and ADHD, considered singly and in combination, do not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and are therefore nonsevere. The

claimant did not initially allege a mental impairment (Exh. 2E, p. 2), nor did he mention a mental impairment in a function report in June 2021 (Exh. 6E), but he later did so a year later (Exh. 7E). The claimant told a provider at Atlanta Behavioral Medicine that his meds are controlling his symptoms, for example, "that his ADHD medication is effective, and allowing him to concentrate throughout the day" and "that his anxiety and depression are under control" (Exh. 63F, p. 115). Mental status exams are also normal throughout the record (Exh. 63F).

In making this finding, the undersigned has considered the broad functional areas of mental functioning set out in the disability regulations for evaluating mental disorders and in the Listing of Impairments (20 CFR, Part 404, Subpart P, Appendix 1). These four broad functional areas are known as the "paragraph B" criteria.

The first functional area is understanding, remembering, or applying information. In this area, the claimant has mild limitation. He alleges anxiety and depression affect his memory and concentration, but can drive and go out alone, shop in stores once or twice a week, and pay bills. His ability to handle money has not been affected. He does not need to be reminded to go places and he does not need someone to accompany him (Exh. 7E, pp. 4-6). Mental status consistently exams describe intact memory and normal intelligence (Exh. 63F; *see, e.g.,* Exh. 63F, p. 31).

The next functional area is interacting with others. In this area, the claimant has mild limitation. He alleges no problems getting along with others, but alleges that, because of his anxiety and depression, he does not feel like meeting people (Exh. 7E, pp. 5-6). Mental status exams consistently describe normal eye contact, neat and clean appearance, normal psychomotor activity, euthymic mood and cooperative attitude (Exh. 63F; *see, e.g.,* Exh. 63F, p. 30).

The third functional area is concentrating, persisting or maintaining pace. In this area, the claimant has mild limitation. He alleges that anxiety and depression affect his concentration, he can only pay attention for a short period of time, and he has difficulty completing tasks; however, limitations are primarily alleged due to physical complaints, i.e., pain and fatigue (Exh. 7E). Moreover, mental status exams consistently describe normal attention span, normal thought content, normal thought process, and all normal findings (Exh. 63F; *see, e.g.,* Exh. 63F, p. 31).

The fourth functional area is adapting or managing oneself. In this area, the claimant has mild limitation. He reports that his ability to handle changes in routine is "normal" and he handles stress with anxiety medication (Exh. 7E, p. 7). Mental status exams consistently describe intact judgment and insight (Exh. 63F; *see, e.g.,* Exh. 63F, p. 31).

Because the claimant's medically determinable mental impairments cause no more than "mild" limitation in any of the functional areas, and the evidence does not otherwise indicate that there is more than a minimal limitation in the claimant's ability to do basic work activities, they are nonsevere (20 CFR 404.1520a(d)(1) and 416.920a(d)(1)).

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment. The following

residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

**4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).**

**5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b) except occasional postural maneuvers; no climbing of ropes, ladders, scaffolds; avoid dangerous moving unguarded machinery and unprotected heights; occasional reaching with the right upper extremity; frequent handling with the left upper extremity.**

In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSR 16-3p. The undersigned also considered the medical opinion(s) and prior administrative medical finding(s) in accordance with the requirements of 20 CFR 404.1520c and 416.920c.

In considering the claimant's symptoms, the undersigned must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical or laboratory diagnostic techniques--that could reasonably be expected to produce the claimant's pain or other symptoms.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities.

The claimant alleges he became disabled from working on October 1, 2020, due to congenital kidney condition, high blood pressure, obesity, and unspecified spinal condition (Exh. 2E, p. 2). However, the objective medical evidence of record, and the evidence as a whole, does not support limitations of such severity that he is disabled from working.

The record shows an "incidental" finding of ectopic kidney on MRI of the lumbar spine on October 22, 2020, two weeks after a motor vehicle collision on October 14, 2020, and for which the claimant was referred to primary care (Exh. 54F, p. 5). On subsequent referral to urology, renal ultrasound on November 4, 2020, showed the right kidney located in the pelvis, and the left kidney in the normal expected position (Exh. 4F, p. 17), and the urologist advised that the right

Firas Ahmad Hajibi (BNC#: 21FG525F51142)                    Page 6 of 14

ectopic kidney "may be more prone to injury but does not need other special management" (Exh. 4F, p. 11). Primary care notes show the claimant also consulted a nephrologist, who indicated the congenital ectopic kidney is "unremarkable" (Exh. 60F, p. 25). The claimant later reported some urinary incontinence and was referred to a neurologist who "said the dribbling and urology issue is from cervical disc disease" (Exh. 60F, p. 25). More recently seen for a consult about his complaint of increasing weakness in the left upper extremity after left carpal tunnel release last year, the claimant "denies any lower extremity symptoms [but] has been experiencing urinary incontinence from time to time" (Exh. 57F, p. 3). This has not been attributed to his ectopic kidney. Nothing in the medical evidence suggests any limitation due to his "congenital kidney condition." The medical evidence of record also points to nothing that suggests more than minimal, if any, limitation due to hypertension. The claimant testified that with medication his blood pressure is fine. The claimant alleged obesity and reported he is 6'1 and 247 pounds (Exh. 2E, p. 2). His BMI is over 30 (Exh. 54F, p. 7; Exh. 55F, p. 6). The claimant's obesity has been considered in accordance with SSR 19-2p. The medical evidence does not explain or otherwise indicate that obesity significantly limits his physical ability to do basic work activities. The claimant's congenital kidney condition, high blood pressure, and obesity are found not severe.

The claimant is a younger individual, age 45, and was age 41 at his alleged onset date. He lives with his wife and 5 children and a housekeeper.[1] As noted in the record, their fifth child was born when expected in November 2022, as indicated by the claimant when he also stated, "he just got a new car" (Exh. 63F, pp. 110, 115). He testified that he was fired from his last job because of discrimination. He also was in a motor vehicle accident in 2020 and recovered a small insurance settlement from that, $5,700, that he testified went toward medical bills. He testified that he has tried to find a job since they have lived in Georgia, but he feels he is disabled by aches and pains. When asked about treatment notes showing he told a counselor in 2021 and 2022 that his occupation is delivery work (*see, e.g.,* Exh. 63F, pp. 2, 30), he acknowledged he did and earned $400 a week in cash. He also had another car accident some time in 2022. He still drives. On April 7, 2023, he "Wishes permanent parking permit tag" (Exh. 6F, p. 44).

The claimant indicated he has aches and pains in his lower back, leg, hands, knees. Lifting and standing a long time makes his back hurt and sometimes he uses his walker, maybe 2 to 3 times a week, depending on how severe his pain is.[2] He indicated he is more limited now by pain since having surgeries.[3] When asked if he vacuums, the claimant testified that his wife does the housework. However, he is getting depressed because he is not able to help the family like before. Also, his wife is getting tired because she is doing everything for the family. He also indicated he has frequent migraines. His representative asked about carpal tunnel syndrome, and the claimant testified that he has pain in his left hand. He has trouble grasping because the left hand hurts a lot. He is right-handed. Neither of his function reports in June 2021 and June 2022

---

[1] Per his function report in June 2022, he indicated he and his wife had 4 children (Exh. 7E). The claimant testified that the last child was just born after he claims he was disabled.

[2] He was apparently prescribed a walker in March 2021 (Exh. 6E, p. 7). He is not described using a walker in the treatment record.

[3] The record reflects a surgical history of left carpal tunnel release in June 2023 (Exh. 55F, p. 5). Otherwise, he has only had injections for the neck, back, shoulder, and knees. As shown below, the claimant was recommended ACDF at C6-7 for his neck pain and cervical radiculopathy in 2021, but declined in favor of continuing injections which he stated help with his pain. However, he appears interested in surgery to address a concern with left upper extremity weakness, based on a record from APEX Spine & Neurosurgery in December 2023 (Exh. 62F, pp. 2-4).

mentioned carpal tunnel or alleged limitation with using his hands, but limitations were alleged primarily with lifting, sitting, and standing, due to a neck and back injury (Exh. 6E, pp. 1, 6; Exh. 7E, pp. 1, 6).

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

The claimant was seen as a new patient at Thrive Medical Partners on October 30, 2020, and complained of injuries to his neck, low back, right shoulder and bilateral knees as a result of a motor vehicle collision that occurred on October 14, 2020. He "was the restrained driver at the time of rear ended collision." He reported the pain was associated with poor sleep, dizziness, and headaches, improved by chiropractic treatment, and aggravated by sitting for long periods and standing for long periods. Home activities he reported not being able to do because of pain were "walking for long distances, meal preparation for self, yard work, including mowing the grass, trimming the bushes, fixing the garden and bathing and using the bathroom" (Exh. 54F, p. 3). MRI of the cervical and lumbar spine had been previously ordered by a chiropractor (Exh. 54F, p. 3; *see* Exh. 9F, 10F). MRI of the cervical spine on October 22, 2020, was read to show spondylosis at various levels and disc herniations at C3-4 and C6-7 "causing canal stenosis" and "possible cord impingement" (Exh. 9F, pp. 20-21). MRI of the lumbar spine showed "disc bulges" at L3-4 and L5, the latter of "the protrusion type" affecting the right L5 nerve root (Exh. 10F, pp. 44-45). The claimant was provided a soft collar for his neck, a right shoulder cortisone injection, and "Celebrex and Omeprazole to start tomorrow for his diffuse low back pain consistent with sacroiliitis." A cervical epidural injection was currently recommended. The claimant was advised to continue with his chiropractor for the lumbar region. As for work status, he could continue working as tolerated (Exh. 54F, pp. 4-5). A few days later, he returned for a pain flare-up which followed after feeling "so good that he went and did some strenuous yard work" (Exh. 54F, p. 7). He was given a cervical trigger point injection at the right paraspinal muscle at C5 (Exh. 54F, p. 9), and a week later, a cervical epidural steroid injection (CESI) (Exh. 54F, p. 11). On November 24, 2020, he was advised he could return to work as tolerated, and if unable due to pain flare up, he could return for reevaluation and FMLA paperwork to be filled out. Otherwise, Celebrex and Omeprazole were refilled, and a better fitted soft collar was dispensed (Exh. 54F, pp. 14, 16). The claimant has since then treated periodically with lumbar and cervical epidural injections by David Neckman, M.D., who was first seen for low back and neck pain on February 11, 2021 (Exh. 11F; *multiple duplicates at* Exh. 5F, 25F, 35F; *see also* Exh. 15F, 29F, 36F, 55F). Physical exams consistently describe normal gait, motor strength, range of motion, reflexes, and sensory exam, and no paraspinous tenderness or spasm palpated, but positive straight leg raise bilaterally, and at times cervical spine tenderness and restricted motion, no assistive device (Exh. 11F, p. 25; Exh. 25F, pp. 13-14, 17; Exh. 29F, pp. 9, 14).

As seen at Advanced Neurosurgery on April 1, 2021, for diffuse neck pain that radiated into both arms and also with intrascapular pain, MRI was reviewed showing "overall minimal degenerative disease appropriate for age" but a larger disc herniation at C6-7 with moderate central cord compression. Surgery was offered as C6-7 ACDF (Exh. 5F, p. 13-14; *duplicate at*

Exh. 35F, pp. 16-17).  On follow up on November 17, 2021, it was noted that the claimant wanted to hold off on surgery and continue with cervical injections and medication for pain relief, stating the injections and Gabapentin helped with his pain.  Regarding his current back pain, it was discussed that his prior lumbar imaging "showed only mild degeneration with no nerve compression" and "that his pain is most consistent with simple back strain and likely [to] respond to a course of steroids."  As for neck pain, this is "typical and persistent cervical radiculopathy" for which he had been previously offered surgery and was again recommended C6-7 discectomy.  The treatment note shows the claimant "**is not weak** but still has significant limitation in **his activities at work** due to pain."  Nevertheless, "he **does not desire** surgery for what amounts to an elective procedure for pain" (Exh. 35F, pp. 1-2) (emphasis added).

The claimant was next seen at Thrive Medical Partners almost two years after his last visit here on August 25, 2022, after another motor vehicle collision that occurred on August 2, 2022.  He reported currently treating with a chiropractor and described aching and throbbing pain in both knees as intermittent, and sharp and shooting pain in the neck and low back, radiating to the shoulders and buttocks, as continuous.  Physical exam revealed no obvious deformity in the neck or back or knees (including no edema or effusion), but tenderness or pain was reported in those regions.  Motor strength testing revealed 5/5 strength bilaterally in the upper and lower extremities.  Straight leg raise was positive, while range of motion testing revealed full range of motion of the knees, and there was good stability in the knees.  X-rays taken on August 25, 2022, showed multilevel disc degeneration and vertebral arthritis, no fracture or dislocation in the cervical or lumbar spine, and no fracture, fragment or bony abnormalities in the knees.  A cervical epidural injection and left-sided lumbar epidural injection were currently recommended for symptoms of cervical radiculopathy and left-sided lumbar radiculopathy.  Currently, the claimant received bilateral knee cortisone injections for knee pain (Exh. 54F, pp. 18-20).

The same day as his motor vehicle collision on August 2, 2022, treatment records from Alliance Spine and Pain Centers show a urine drug sample was collected and results were inconsistent with prescribed medications, in that they were negative, showing no pain medication (Exh. 36F, p. 25).  When the claimant went to the ER on August 23, 2022, he complained his lower back pain was worse after having his back adjusted by the chiropractor the day before.  He denied urinary incontinence, trauma, or other complaint.  After pain medicine, he "has normal strength throughout all aspects of both lower extremities" and has a "strong and steady gait."  A preliminary MRI of the lumbar spine was normal (Exh. 33F, pp. 11-12, 29).  The final report described "unremarkable" findings at every level except L3-4 and L4-5, where there was mild bilateral facet joint hypertrophy.  Additionally, there was a disc protrusion at L4-5 slightly compressing the descending right L5 nerve root (Exh. 33F, p. 76).

The claimant has continued to have injections by Dr. Neckman.  For example, as seen at Alliance Spine and Pain Centers on September 7, 2023, he had a CESI at C7-T11 (Exh. 55F, p. 3), and on October 5, 2023, he reported 50% relief (Exh. 55F, p. 9).  After bilateral transforaminal epidural steroid injection at L4-5 on November 2, 2023 (Exh. 55F, p. 15), as seen on December 21, 2023, he "reports 60% relief for 4 weeks with improvement in ADLs/functionality."  He also "reports his medications work moderately well without side effects" (Exh. 55F, p. 21).  On exams of the cervical and lumbar spine, there are "No obvious deformities", but he is tender in the paraspinous muscles bilaterally, and has pain with motion, though decreased motion is not

described.  Motor strength and sensory exams are "Normal."  Antalgic forward leaning posture is described for the cervical spine, but gait is "Normal" (Exh. 55F, pp. 12, 23-24).  According to the pain center notes, "Functional Disabilities" are shown as "unable to sit for long periods, unable to stand for long periods, unable to do heavy lifting" (*see, e.g.,* Exh. 55F, pp. 4, 9).

On October 10, 2023, the claimant presented at Atlantic Advanced Spine and Neurology Institute for neck pain and radicular pain, worsened by bending, twisting, turning, and standing, and improved some by pain meds and rest.  He also complained of shoulder pain and moderate to severe headache going on for the past 3 months, felt likely due to migraine.  MRI of the cervical spine from 2020 was reviewed, and he could consider occipital nerve block for better pain relief and/or MRI of the brain to rule out brain tumor.  Otherwise, medications were prescribed, he was asked to start physical therapy and "was extensively educated for good sleep hygiene, weight control, healthy lifestyle, exercise regularly, smoke cessation, follow PCP and [to be] compliant to medication treatment" (Exh. 53F, pp. 6-7).  MRI of the cervical spine on October 12, 2023, showed "[m]ultilevel ***mild*** chronic degenerative changes… No acute cervical spine pathology … There has been no significant interval change relative to a prior study from October 22, 2020" (Exh. 54F, pp. 10-11; *duplicate at* Exh. 62F) (emphasis added).  As seen to review the recent imaging and for follow up on November 22, 2023, the claimant reported having had a superorbital nerve block which provided 60% pain relief.  He "has new complaint of dizziness" (Exh. 53F, p. 3).  On neurological exam, language was fluent, expression, naming, repetition, comprehension intact, able to follow complex commands in all 4 extremities, and motor and sensory exam "are grossly normal except slight sensory loss at fingertips.  No pathological reflexes."  The spine was tender at the cervical local region as the claimant described, while also found to have a "normal gait/pace/balance."  He had cervical facet pain causing decreased range of motion in the shoulder on a Spurling test, as well as shoulder pain with various special tests (Exh. 53F, p. 4).  MRI of the brain on December 18, 2023, was normal (Exh. 62F, p. 8).

As noted above, the claimant had left carpal tunnel release in June 2023 (Exh. 50F, p. 98), after which he complained of increasing left upper extremity weakness and continued numbness at the surgery site.  EMG/nerve conduction studies of the bilateral upper extremities in October 2023 revealed median neuropathy, significantly improved on the left, and evidence of chronic cervical radiculopathy without active denervation (Exh. 57F, p. 1).  On motor exam on October 5, 2023, he had normal power of 5/5 in the proximal and distal muscles of the right upper and bilateral lower extremities in all muscle groups.  On the left side there was "subtle weakness throughout, power -5/5" (Exh. 57F, p. 3).  Repeat EMG/nerve conduction studies of the upper extremities were performed in January 2024.  While incomplete median nerve recurrent thena motor branch injury on the left side or small fiber neuropathy could not be ruled out, the study showed no sign of acute radiculopathy, carpal tunnel syndrome, polyneuropathy or myopathy (Exh. 61F, p. 1).

As for medical opinion(s) and prior administrative medical finding(s), the undersigned cannot defer or give any specific evidentiary weight, including controlling weight, to any prior administrative medical finding(s) or medical opinion(s), including those from the claimant's own medical sources.  The undersigned has fully considered the medical opinions and prior administrative medical findings as follows:

See Next Page

State agency medical consultants, providing review of the record through January 2022 and through August 2023, opined that the claimant could perform light work.  The initial reviewing state agency medical consultant opined that the claimant could frequently perform postural maneuvers, except occasional climbing ladders, ropes, or scaffolds, and he should avoid even moderate exposure to hazards.  No other limitations, including any manipulative limitations, were found (Exh. 3A, pp. 5-6; Exh. 4A).  The state agency medical consultant reviewing the record on reconsideration limited all postural maneuvers to occasional, similarly indicated hazards should be avoided for even moderate exposure, and additionally assessed manipulative limitations of occasional reaching with the right upper extremity, and frequent handling with the left upper extremity (Exh. 5A, pp. 6-7; Exh. 6A).  Each of the prior administrative medical findings are well supported by the relevant evidence cited in their respective reviews, and are persuasive.  The more recent opinion of limitations in August 2023 is more persuasive, as it takes into account the right shoulder issues and mild carpal tunnel syndrome, status post left carpal tunnel release in June 2023 (Exh. 5A, pp. 9-10), which are arguably nonsevere, but can be captured in the above severe impairment of degenerative joint disease.  Occasional postural limitations are also found more appropriate because of his cervical disc disease.

An unidentified provider on November 15, 2021, indicated the claimant was seen that day at Alliance Spine and Pain Centers for neck and lower back pain and would like to continue conservative treatment for his pain.  He was currently "recommended" lifting no more than 15-20 pounds and sitting and/or standing for 30-minute intervals (Exh. 16F; *duplicate at* Exh. 45F).  With no explanation or duration for the limitations given, the opinion is not persuasive.

David Neckman, M.D. signed a pain evaluation form on March 24, 2022, noting the claimant was first seen on February 11, 2021, has pain in the low back and legs, and pain would frequently interfere with attention and concentration (Exh. 17F, p. 1).  An attached 4-page physical capabilities evaluation form was not signed by Dr. Neckman and it cited to a functional capacity evaluation (FCE) that was not attached to the form (Exh. 17F, pp. 2-5).  There is no explanation or reference to objective findings for any limitations or severity of symptoms noted on either form.  The forms were created by the claimant's representative and are conclusory for limitations, unsupported and not persuasive.

Another pain evaluation form and attached physical capabilities evaluation form, the latter dated September 27, 2022, reflect the same signature for one who is not identified (Exh. 20F, pp. 1, 5), except as "PCP" (Exh. 20F, p. 4), the signature matching Chang Soo Kim, M.D., the claimant's primary care physician (*see* Exh. 59F).  The claimant is reported to currently be seeing an orthopedic surgeon and pain management doctor, neither of whom completed the forms, though the responses are purported to be "based on orthopedic specialist's evaluation form" (Exh. 20F).  Dr. Kim indicates he has treated the claimant since September 2020 (Exh. 20F, p. 4), but notes the claimant has had the pain since the "first visit" on March 9, 2021 (Exh. 20F, p. 1).  The only medical record on March 9, 2021, is an initial physical therapy evaluation at Eastside Medical Center Outpatient Rehabilitation with Gregory Carefoot, PT[4] (Exh. 8F, p. 2), whose signature

---

[4] According to a physical therapy discharge summary by PT Carefoot on April 26, 2021, the claimant's ambulation on even terrain was normal.  He had met a long-term goal of being able to sit greater than 30 minutes "with minimal discomfort" but had not met goals to be able to stand greater than 30 minutes "with minimal discomfort", walk greater than 20 minutes "with minimal discomfort", or lift 40 pounds "with proper body mechanics and minimal

Firas Ahmad Hajibi (BNC#: 21FG525F51142)                Page 11 of 14

(Exh. 8F, p. 5) is not that of Dr. Kim's (Exh. 20F, pp. 1, 5). Dr. Kim checked "No" for whether limitations given had lasted or could be expected to last at least 12 months (Exh. 20F, p. 4), which does not support a severe impairment. Dr. Kim also checked "No" for whether the claimant had an impairment that could reasonably be expected to cause a disabling level of pain (Exh. 20F, p. 5). Thus, his opinions appear internally inconsistent. There is also no explanation or even reference to objective findings for any of the limitations or severity of symptoms indicated on either form. Thus, the opinions are conclusory and unsupported and not persuasive.

Dr. Kim's primary care notes show "wishes handicap decal" in March 2021 (Exh. 6F, p. 26), and an application for a disabled parking placard was also signed by Dr. Kim on April 10, 2023 (Exh. 59F). The record gives no explanation for how the claimant meets the eligibility requirements. The undersigned further recognizes that possession of such a placard is not especially difficult to obtain and generally requires only a signed form from a physician. This is not persuasive for finding any limitations.

On December 7, 2021, a physical therapist recommends "that movements that involve bending over or quick position changes are avoided or minimized for patient safety." Stephen Lopez, PT indicates this recommendation is based on the claimant suffering from "movement elicited dizziness" which does not appear to be a confirmed diagnosis anywhere (Exh. 18F). The claimant was seen by a neurologist in June 2021 for dizziness since the accident in October 2020 which he described as occurring when he bends down to pray every day and "feels the room is spinning." The neurologist assessed probable benign positional vertigo, and referred him to vestibular therapy, which the claimant did not attend until only the day before his follow up in October 2021. The neurologist then gave him a note for work "that he should avoid bending for a month due to ongoing vertigo" (Exh. 12F, p. 3). The work restriction from the neurologist in 2021 is not a permanent restriction and is not persuasive for one, but rather indicates ongoing work activity after the alleged onset date. And as shown by primary care notes in May 2021, when a neurology referral was sought, the context provided that the claimant "Works outside, thus possible dehydration vs cardiac etiology considered." Cardiology had been consulted and the heart was "unremarkable (normal)" (Exh. 6F, p. 21; *see also* Exh. 6F, p. 26).

Another pain evaluation signed by Dr. Neckman and dated September 7, 2023, again shows the claimant has pain in the low back and legs, and pain would frequently interfere with attention and concentration (Exh. 45F, p. 1). An attached 4-page physical capabilities evaluation form, this time signed by Dr. Neckman, again cites to a functional capacity evaluation (FCE) that is this time attached to the form (Exh. 45F, pp. 2-5). The FCE is from February 2022 and shows the claimant "demonstrated the ability to perform 63.1% of the physical demands of his job as a Delivery Person", which was in the medium exertional physical demand category, and he further demonstrated the ability to perform within the medium physical demand category for up to 8 hours a day if able to alternate between sitting and standing (Exh. 45F, p. 6). It was also noted the "overall results of this evaluation do not represent a true and accurate representation of this client's overall physical capabilities. The functional results of this evaluation represent a minimal level of functioning for this client" (Exh. 45F, p. 7). Additionally, the limitations in the physical capabilities form signed by Dr. Neckman and the FCE are not consistent with each

---

discomfort" (Exh. 8F, p. 17). The physical therapy goals as described, met and not met, do not suggest or support that the claimant's current pain was of a disabling level of severity.

Firas Ahmad Hajibi (BNC#: 21FG525F51142)                    Page 12 of 14

other, and otherwise there is no explanation or reference to objective findings for any limitations or severity of symptoms noted on either form signed by Dr. Neckman. As seen by Dr. Neckman for pain management with injections, the claimant typically reports pain of 9/10. But as noted above, objective findings on physical exams describe normal gait, motor strength, range of motion, reflexes, and sensory exam, no paraspinous tenderness or spasm palpated, but positive straight leg raise bilaterally, at times cervical spine tenderness and restricted motion, but no assistive device (Exh. 11F, p. 25; Exh. 25F, pp. 13-14, 17; Exh. 29F, pp. 9, 14). On exams of the cervical and lumbar spine, there are "No obvious deformities", but the claimant is tender in the paraspinous muscles bilaterally, and has pain with motion, though decreased motion is not described. Motor strength and sensory exams are "Normal." Antalgic forward leaning posture is described for the cervical spine, but gait is "Normal" (Exh. 55F, pp. 12, 23-24). In still another exhibit, there are three more forms signed by Dr. Neckman and dated July 28, 2022. The first form indicates the claimant meets listing 1.15 with a documented medical need for an assistive device (Exh. 32F, pp. 1-3), and the next two indicate he does not meet listing 1.16 or 1.23 for reasons including responses contradicting those on the first form relative to a documented medical need for an assistive device or the inability to use both upper extremities (Exh. 32F, pp. 4-6, 7). The zealous advocacy of the claimant's representatives notwithstanding, none of this is established or shown by the medical evidence of record. The opinions on forms even signed by Dr. Neckman are not supported by physical exams in his own treatment records and they are not otherwise supported by the evidence of record discussed above. They are unsupported, internally inconsistent, and not persuasive.

On a pain evaluation form dated December 20, 2023, Haiyan Wang, APRN reports the claimant has experienced pain as a headache for greater than 6 months, and severe enough to frequently interfere with attention and concentration (Exh. 56F). There is also no explanation or reference to objective findings for the severity of symptoms noted on this form, and it is not persuasive.

In duplicates submitted on January 3, 2024, for no claimant identified by either a name or social security number, Shyam Vekaria, M.D. of Piedmont Orthopedics/OrthoAtlanta reports there has been pain in both knees since approximately July 2022, rated 8-9 out of 10 on a pain scale, and severe enough to frequently interfere with attention and concentration for simple tasks (Exh. 58F, pp. 6-7). Assuming the form is intended to apply to the claimant, there is no explanation or reference to objective findings for the severity of symptoms noted. According to treatment notes, the claimant alleges a pain level of 5 out of 10 (Exh. 40F, pp. 10, 13, 31, 48; *duplicates at* Exh. 50F), not 8-9 (Exh. 58F, p. 6). The claimant reports pain is "worse with kneeling as well" (Exh. 40F, p. 9), but pain is improved with Voltaren topical gel (Exh. 40F, p. 14). In similar fashion on another form, Dr. Vekaria shows listing 1.18 is not met, as there is no documented medical need for an assistive device or an inability to use one or both upper extremities to independently initiate, sustain, and complete work-related activities involving fine and gross movements (Exh. 58F, pp. 1-4). But there is also no support for other findings on this form. The treatment record shows the claimant has full range of motion in both knees, no instability or immobility affecting the joints. He also has only mild swelling and mild tenderness, if any, on examination of the knees (Exh. 40F, pp. 11, 15, 32-33, 50). He had minimal findings on x-ray of the knees in July 2022 (Exh. 31F). The limitations and severity of symptoms suggested on these forms, assuming they are intended to apply to the claimant, are unsupported and not persuasive.

**6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).**

The claimant has past relevant work as a delivery driver (DOT #905.663-014, medium, semiskilled, SVP 4) and as a cook (DOT #315.361-010, medium, skilled, SVP 6).  This work was substantial gainful activity, performed long enough to learn, and within the relevant period.  In response to a hypothetical question that assumed an individual with the same age, education, past work, and residual functional capacity as the claimant, the vocational expert testified that such an individual could not perform the claimant's past relevant work.  The undersigned accepts the vocational expert's testimony and finds that the demands of the claimant's past relevant work exceed his residual functional capacity.  Pursuant to SSR 00-4p, the undersigned has determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles.  Accordingly, the claimant is unable to perform past relevant work as actually or generally performed.

**7.    The claimant was born on March 23, 1979, and was 41 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).**

**8.    The claimant has at least a high school education (20 CFR 404.1564 and 416.964).**

**9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).**

**10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).**

In determining whether a successful adjustment to other work can be made, the undersigned must consider the claimant's residual functional capacity, age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2.  If the claimant can perform all or substantially all of the exertional demands at a given level of exertion, the medical-vocational rules direct a conclusion of either "disabled" or "not disabled" depending upon the claimant's specific vocational profile (SSR 83-11).  When the claimant cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has nonexertional limitations, the medical-vocational rules are used as a framework for decisionmaking unless there is a rule that directs a conclusion of "disabled" without considering the additional exertional and/or nonexertional limitations (SSRs 83-12 and 83-14).  If the claimant has solely nonexertional limitations, section 204.00 in the Medical-Vocational Guidelines provides a framework for decisionmaking (SSR 85-15).

If the claimant had the residual functional capacity to perform the full range of light work, a finding of "not disabled" would be directed by Medical-Vocational Rule 202.21.  However, the claimant's ability to perform all or substantially all of the requirements of this level of work has

been impeded by additional limitations.  To determine the extent to which these limitations erode the unskilled light occupational base, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity.  The vocational expert testified that given all of these factors, such an individual would be able to perform the requirements of representative occupations such as ironer (DOT #590.685-042, light, unskilled, SVP 2), 250,000 jobs in the national economy; counter clerk (DOT #249.366-010, light, unskilled, SVP 2), 450,000 jobs in the national economy; and bakery conveyor line worker (DOT #524.687-022, light, unskilled, SVP 2), 200,000 jobs in the national economy.  The number of jobs for any one of the representative occupations identified is significant by itself.

Pursuant to SSR 00-4p, the undersigned has determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles, and for those issues that are not addressed by the DOT, the vocational expert testified that his opinion is based on his education, training, and professional experience.

Based on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy.  A finding of "not disabled" is therefore appropriate under the framework of the above-cited rule.

**11.  The claimant has not been under a disability, as defined in the Social Security Act, from October 1, 2020, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).**

<u>**DECISION**</u>

Based on the application for a period of disability and disability insurance benefits protectively filed on April 2, 2021, the claimant is not disabled under sections 216(i) and 223(d) of the Social Security Act.

Based on the application for supplemental security income protectively filed on April 2, 2021, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

/s/ *Cynthia Weaver*
_____
Cynthia Weaver
Administrative Law Judge

April 29, 2024
_____
Date

# LIST OF EXHIBITS

## Payment Documents/Decisions

| Component | No. | Description | Received | Dates | Pages |
|---|---|---|---|---|---|
| X83 | 1A | Initial Disability Determination by State Agency, Title XVI | | 2022-01-24 | 1 |
| X83 | 2A | Initial Disability Determination by State Agency, Title II | | 2022-01-24 | 1 |
| X83 | 3A | Disability Determination Explanation DDE:T2 INITIAL/PRT & RFC DDS DR NO MRFC | | 2022-01-24 | 8 |
| X83 | 4A | Disability Determination Explanation DDE:T16 INITIAL/RFC BY DDS MD/NO MRFC | | 2022-01-24 | 8 |
| X83 | 5A | Disability Determination Explanation DDE: T2 RECON RFC BY DDS DR/ NO MRFC | | 2023-08-24 | 11 |
| X83 | 6A | Disability Determination Explanation DDE: T16 RECON/ RFC BY DDS DR/NO MRFC | | 2023-08-24 | 11 |
| X83 | 7A | Disability Determination Transmittal | | 2023-08-24 | 1 |
| X83 | 8A | Disability Determination Transmittal | | 2023-08-24 | 1 |

## Jurisdictional Documents/Notices

| Component | No. | Description | Received | Dates | Pages |
|---|---|---|---|---|---|
| X83 | 1B | SSA-1696 - Claimant's Appointment of a Representative | | 2021-04-02 | 6 |
| X83 | 2B | T2 Notice of Disapproved Claim | | 2022-01-24 | 5 |
| X83 | 3B | T16 Notice of Disapproved Claim | | 2022-01-24 | 5 |

| | | | | |
|---|---|---|---|---|
| X83 | 4B | Request for Reconsideration | 2022-01-28 | 2 |
| X83 | 5B | Fee Agreement for Representation before SSA | 2022-04-14 | 1 |
| X83 | 6B | SSA-1696 - Claimant's Appointment of a Representative | 2022-04-14 | 6 |
| X83 | 7B | SSA-1696-SUP2 - Representative's Withdrawal of Acceptance of Appointment | 2022-04-29 | 2 |
| X83 | 8B | T2 Disability Reconsideration Notice | 2023-08-24 | 4 |
| X83 | 9B | T16 Disability Reconsideration Notice | 2023-08-24 | 4 |
| X83 | 10B | Request for Hearing by ALJ | 2023-08-29 | 2 |
| X83 | 11B | SSA-1696 - Claimant's Appointment of a Representative | 2023-08-30 | 11 |
| X83 | 12B | Fee Agreement / Kathleen Flynn, Attorney (25%/$7,200) | 2023-08-29 | 5 |
| X83 | 13B | Outgoing ODAR Correspondence- REMOTE HEARING LETTER- K. FLYNN | 2023-10-23 | 18 |
| X83 | 14B | Outgoing ODAR Correspondence-MY SSA LETTER- K. FLYNN | 2023-10-23 | 4 |
| X83 | 15B | Request for Hearing Acknowledgement Letter | 2023-10-24 | 21 |
| X83 | 16B | Hearing Agreement Form | 2023-10-25 | 2 |
| X83 | 17B | Hearing Notice | 2023-11-20 | 16 |
| X83 | 18B | Representative Correspondence | 2023-11-30 | 1 |
| X83 | 19B | Notice Of Hearing Reminder | 2024-02-09 | 4 |
| X83 | 20B | Fee Agreement for Representation before SSA | 2024-03-04 | 3 |

| X83 | 21B | SSA-1696 - Claimant's Appointment of a Representative | | 2024-03-04 | 4 |
| X83 | 22B | Fee Agreement for Representation before SSA | | 2024-03-04 | 4 |

## Non-Disability Development

| Component | No. | Description | Received | Dates | Pages |
|-----------|-----|-------------|----------|-------|-------|
| X83 | 1D | Detailed Earnings Query | | 2023-11-20 | 14 |
| X83 | 2D | Summary Earnings Query | | 2023-11-20 | 1 |
| X83 | 3D | New Hire, Quarter Wage, Unemployment Query (NDNH) | | 2023-11-20 | 1 |
| X83 | 4D | Application for Supplemental Security Income Benefits | | 2021-05-19 | 12 |
| X83 | 5D | Application for Disability Insurance Benefits | | 2021-04-05 | 4 |
| X83 | 6D | Internet: Third-Party Filers Wet Signature Page | | 2021-04-02 | 6 |
| X83 | 7D | Certified Earnings Records | | 2024-02-01 | 2 |

## Disability Related Development

| Component | No. | Description | Received | Source | Dates | Pages |
|-----------|-----|-------------|----------|--------|-------|-------|
| X83 | 1E | Disability Report - Field Office | | | to 2021-05-19 | 3 |
| X83 | 2E | Disability Report - Adult | | | to 2021-05-19 | 11 |
| X83 | 3E | Work History Report | | Firas Hajibi | to 2021-06-19 | 8 |
| X83 | 4E | Disability Report - Appeals | | Firas Hajibi | to 2022-02-02 | 9 |
| X83 | 5E | Disability Report - Field Office | | | to 2022-02-02 | 3 |
| X83 | 6E | Function Report - Adult (Incomplete - Missing page 10) | | Firas Hajibi | to 2021-06-24 | 7 |

| | | | | Source | Dates | Pages |
|---|---|---|---|---|---|---|
| X83 | 7E | Function Report - Adult | | Firas Ahmad Hajibi | to 2022-06-02 | 8 |
| X83 | 8E | Disability Report - Appeals | | Firas Hajibi | to 2023-09-06 | 10 |
| X83 | 9E | Disability Report - Field Office | | | to 2023-09-06 | 2 |
| X83 | 10E | Correspondence regarding efforts to obtain evidence | | | 2024-02-07 to | 2 |
| X83 | 11E | Resume of Vocational Expert | | | 2024-03-03 to | 8 |

## Medical Records

| Component | No. | Description | Received | Source | Dates | Pages |
|---|---|---|---|---|---|---|
| X83 | 1F | Office Treatment Records | | Ag Family Medicine | to 2020-10-20 | 10 |
| X83 | 2F | Laboratory Test Report | | Ag Family Medicine | to 2021-01-05 | 9 |
| X83 | 3F | Office Treatment Records | | Ag Family Medicine | 2020-09-30 to 2021-06-16 | 40 |
| X83 | 4F | Office Treatment Records | | North Atlanta Urology Associates - M | 2020-10-29 to 2021-05-27 | 18 |
| X83 | 5F | Office Treatment Records | | Advanced Neurosurgery Associates | 2021-04-01 to 2021-04-08 | 17 |
| X83 | 6F | Office Treatment Records | | Ag Family Medicine | 2020-09-30 to 2021-06-24 | 29 |
| X83 | 7F | Office Treatment Records | | Ag Family Medicine | 2020-09-30 to 2021-06-24 | 30 |
| X83 | 8F | Office Treatment Records | | East Side Physicians Building | 2021-03-09 to 2021-04-26 | 36 |
| X83 | 9F | Office Treatment Records | | Iceberg Health Llc | 2020-10-22 to 2020-11-18 | 21 |
| X83 | 10F | Office Treatment Records | | Iceberg Health Llc | 2020-10-20 to 2020-11-17 | 58 |

| X83 | 11F | Office Treatment Records | Noble Resource Corporation | 2021-02-11 to 2021-07-15 | 35 |
|---|---|---|---|---|---|
| X83 | 12F | Office Treatment Records | Gwinnett Neurology & Sleep Disorders Clinic | 2021-06-30 to 2021-10-28 | 3 |
| X83 | 13F | Hospital Records | Piedmont Eastside Medical Center | 2021-07-19 to 2021-10-27 | 10 |
| X83 | 14F | Office Treatment Records | Atlanta Heart Specialists Llc | 2020-10-13 to 2020-11-05 | 13 |
| X83 | 15F | Office Treatment Records | Noble Resource Group | 2021-02-11 to 2021-12-09 | 31 |
| X83 | 16F | Medical Opinion - Physical | Alliance Spine | to 2021-11-15 | 2 |
| X83 | 17F | Pain Evaluation | Alliance Spine | to 2022-03-24 | 5 |
| X83 | 18F | Medical Opinion - Physical | Stephen Lopez, Pt | to 2021-12-07 | 2 |
| X83 | 19F | Hospital Records | Piedmont Walton Hospital Inc | to 2022-01-11 | 24 |
| X83 | 20F | Medical Opinion - Pain Evaluation and a Physical Capabilities Evaluation | Orthopedic Surgeon And Pain Management | to 2022-09-27 | 5 |
| X83 | 21F | Hospital Records | Northside Hospital Duluth | 2021-11-26 to 2021-11-29 | 26 |
| X83 | 22F | Office Treatment Records | Alliance Spine | 2022-04-14 to 2022-04-18 | 88 |
| X83 | 23F | Office Treatment Records | Ag Family Medicine | 2022-05-31 to 2022-06-06 | 84 |
| X83 | 24F | Office Treatment Records | Atlanta Gastroenterology Associates Llc | 2021-10-29 to 2021-12-17 | 10 |

| X83 | 25F | Office Treatment Records | Neurosurgery & Spine Associates | 2021-02-18 to 2021-11-17 | 20 |
|---|---|---|---|---|---|
| X83 | 26F | Office Treatment Records | Gwinnett Neurology & Sleep Disorders Clinic | to 2021-10-28 | 6 |
| X83 | 27F | Hospital Records | Piedmont Walton | to 2022-01-11 | 52 |
| X83 | 28F | Office Treatment Records | Ag Family Medicine | to 2022-04-11 | 46 |
| X83 | 29F | Office Treatment Records | Alliance Spine And Pain Center | 2021-02-03 to 2022-06-13 | 37 |
| X83 | 30F | Office Treatment Records | Gwinnett Neurology & Sleep Disorders Clinic | 2021-06-30 to 2021-10-28 | 6 |
| X83 | 31F | Office Treatment Records | Ortho Atlanta | to 2022-07-19 | 1 |
| X83 | 32F | Medical Assessment Physical Ability-Work Related Activities | Alliance Spine | to 2022-07-28 | 8 |
| X83 | 33F | Inpatient Hospital Records | Northside Hospital | 2022-08-22 to 2022-08-23 | 92 |
| X83 | 34F | Medical Report/General | Advanced Imaging Centers | to 2022-08-12 | 2 |
| X83 | 35F | Office Treatment Records | Neurosurgery & Spine Associates | to 2021-11-17 | 20 |
| X83 | 36F | Hospital Records | Alliance Spine & Pain- Dr. Neckman | 2022-08-10 to 2022-12-01 | 25 |
| X83 | 37F | Office Treatment Records | Headache And Neurological Care Center | 2023-01-03 to 2023-02-01 | 26 |
| X83 | 38F | Office Treatment Records | Ag Family Medicine | 2022-09-27 to 2023-04-01 | 25 |
| X83 | 39F | Office Treatment Records | Advanced Neurosurgery Assoc | 2021-02-11 to 2021-11-17 | 23 |

| | | | | | |
|---|---|---|---|---|---|
| X83 | 40F | Office Treatment Records | Piedmont Orthopedics - Ortho Atlanta | to 2023-01-03 | 73 |
| X83 | 41F | HIT MER | Piedmont Healthcare | 2022-01-11 to 2023-09-05 | 281 |
| X83 | 42F | Office Treatment Records | Ag Family Medicine | 2023-04-12 to 2023-07-18 | 17 |
| X83 | 43F | Hospital Records | Alliance Spine And Pain Centers | 2023-01-26 to 2023-08-17 | 55 |
| X83 | 44F | Physical/Occupational Therapy Records | Piedmont Eastside Medical Center | 2021-10-27 to 2023-08-30 | 191 |
| X83 | 45F | Medical Assessment Mental Ability-Work Related Activities- Pain Evaluation | Dr. David Neckman | to 2023-09-07 | 15 |
| X83 | 46F | Office Treatment Records | Atlantic Advanced Spine And Neurology Institute | 2023-09-18 to 2023-09-18 | 5 |
| X83 | 47F | Office Treatment Records | Georgia Eye Associates | 2022-07-08 to 2022-07-08 | 11 |
| X83 | 48F | Office Treatment Records | Optimum Health Rehab | 2022-08-17 to 2022-09-08 | 71 |
| X83 | 49F | Office Treatment Records | Orthoatlanta | 2023-01-24 to 2023-01-24 | 9 |
| X83 | 50F | Office Treatment Records | Orthoatlanta | 2023-02-28 to 2023-10-09 | 134 |
| X83 | 51F | Physical/Occupational Therapy Records | Piedmont Eastside Medical Center | 2023-09-05 to 2023-11-11 | 116 |
| X83 | 52F | Office Treatment Records | Orthoatlanta | 2023-10-17 to 2023-11-21 | 31 |

| X83 | 53F | Office Treatment Records | Atlantic Advanced Spine And Neurology Institute | 2023-10-12 to 2023-11-22 | 11 |
|---|---|---|---|---|---|
| X83 | 54F | Progress Notes | Thrive Medical Partners | 2020-10-30 to 2022-08-25 | 21 |
| X83 | 55F | Office Treatment Records | Alliance Spine And Pain Centers | 2023-09-27 to 2023-12-21 | 26 |
| X83 | 56F | Pain Evaluation | Haiyan Wang, Aprn | to 2023-12-20 | 1 |
| X83 | 57F | Office Treatment Records | Headache And Neurological Care Center | 2023-10-05 to 2023-10-11 | 6 |
| X83 | 58F | Listing Questionnaires/ Pain Evaluation Forms | Dr, Shyam Veraria | to 2024-01-03 | 8 |
| X83 | 59F | Misc Medical Records- GA Dept of Motor Vehicles Disability Parking Application | Chang Soo Kim, Md | to 2023-04-10 | 1 |
| X83 | 60F | Office Treatment Records | Ag Family Medicine | 2023-11-06 to 2024-02-22 | 39 |
| X83 | 61F | Office Treatment Records | Ag Family Medicine | 2024-01-10 to 2024-02-23 | 15 |
| X50 | 62F | Medical Evidence of Record | Apex Spine And Neurosurgery | 2023-02-21 to 2023-12-11 | 152 |
| X50 | 63F | Medical Evidence of Record | Atlanta Behavioral Medicine | 2021-07-25 to 2024-02-20 | 135 |